UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

MORGAN AMANDA LEPPERT,

       Petitioner,

v.                                                  Case No. 3:21-cv-292-MMH-LLL

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

       Respondents.

_____

## ORDER

### I. Status

Petitioner Morgan Amanda Leppert, an inmate of the Florida penal system, is proceeding through counsel on a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (Petition; Doc. 1) with a supporting memorandum (Pet. Memo.; Doc. 3). Leppert initiated this action in the Ocala Division, but because she challenges a Putnam County, Florida judgment of conviction, the assigned judge transferred the case to this Court. See Order (Doc. 10). Respondents submitted a response to the Petition (Response; Doc. 12) with exhibits (Exs.;

Docs. 13-1, 18-1, 18-2).[1] Leppert filed a reply (Reply; Doc. 14). This action is ripe for review.

## II. Relevant Procedural History

On May 22, 2008, a Florida grand jury returned an indictment against Leppert, who was then only 15 years old, charging three felony offenses: first-degree murder; burglary with assault or battery; and robbery with a deadly weapon. Ex. A at 1-2. Specifically, the State of Florida charged Leppert with the murder of James Thomas Stewart, who Leppert allegedly "beat[], stabb[ed] . . . with a knife, and suffocat[ed]" on April 25, 2008, while perpetrating or attempting to perpetrate a burglary or robbery. Id. at 1.

On August 7, 2009, Leppert proceeded to a jury trial in Putnam County Case No. 08-1171-CF-53. Ex. K. According to trial testimony, which included two recorded statements by Leppert, she wanted to run away with her 22-year-old boyfriend, Toby Lowry, but they did not have a vehicle or money, so they planned to steal both from a random person. Id. at 737. With that intention, they snuck into Stewart's home, and ultimately Lowry, with Leppert's assistance, beat, stabbed, and suffocated Stewart. Id. at 720-22. Leppert and

---

[1] Per the Court's Order (Doc. 17), Respondents re-filed exhibits H, I, K, and O on March 11, 2024 (Doc. 18), because the original copies were incomplete. Citations to exhibits H, I, K, and O will be to those docketed on March 11, 2024 (Docs. 18-1, 18-2).

Lowry were taken into custody on May 3, 2008, in Texas, where they had driven in Stewart's truck after the murder. Id. at 530-31, 731. Initially, Leppert was held in a juvenile detention center as a victim/witness because Leppert's mother had reported to authorities that she had been missing since April 22, 2018, and an Amber Alert eventually had been issued. Id. at 537-38, 542, 560, 568, 647. The scope of the investigation changed after investigators interviewed Lowry, who implicated Leppert in the crimes, including Stewart's murder. Id. at 718-19.[2]

The jury found Leppert guilty on all charges. Id. at 985; Ex. M. The trial court sentenced her in open court on September 29, 2009, to life without the possibility of parole for first-degree murder and to concurrent life sentences for burglary and robbery, Ex. O at 14, and entered a written judgment that same day, Ex. P. Leppert appealed, and during the pendency of her appeal, filed a counseled motion to correct a sentencing error under Florida Rule of Criminal Procedure 3.800(b)(2). Ex. Q. In doing so, she argued that the sentences for the nonhomicide convictions violated Graham v. Florida, 560 U.S. 48 (2010).[3] See generally id. The trial court granted the motion and resentenced Leppert to

---

[2] Leppert told authorities that she willingly ran away from home to be with Lowry. Ex. K at 601.

[3] In Graham, the Supreme Court held that "the Eighth Amendment prohibits a State from imposing a life without parole sentence on a juvenile nonhomicide offender." 560 U.S. at 75.

concurrent 50-year terms on the nonhomicide convictions, Ex. S at 12, and entered an amended judgment on July 30, 2010, <u>nunc pro tunc</u> to the date of the original judgment, Ex. T. The court left the sentence on the homicide conviction unchanged. <u>See id.</u>

On direct appeal, the Fifth District Court of Appeal per curiam affirmed Leppert's convictions and sentences without a written opinion. Ex. X (case number 5D09-3462). After denying Leppert's motion for rehearing, the Fifth DCA issued the mandate. Ex. Z; Ex. AA. Thereafter, Leppert filed a pro se petition for writ of habeas corpus in the Fifth DCA alleging the ineffective assistance of appellate counsel, Ex. BB, which the Fifth DCA denied, Ex. CC (case number 5D13-3628).

Proceeding through counsel, Leppert next filed a motion for postconviction relief under Rule 3.850, Ex. FF,[4] and a motion to correct illegal sentence under Rule 3.800(a), Ex. VV (Amended Rule 3.800(a) Motion). As grounds for resentencing, Leppert cited Supreme Court precedent and Florida's recently enacted juvenile sentencing legislation. <u>Id.</u> at 2 (citing <u>Miller v. Alabama</u>, 567 U.S. 460 (2012);[5] Fla. Stat. §§ 775.082, 921.1401, 921.1402).

---

[4] Leppert originally filed her Rule 3.850 Motion pro se. Ex. EE.

[5] In <u>Miller</u>, the Supreme Court held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without the possibility of parole for juvenile offenders." 567 U.S. at 479. "Responding to <u>Miller</u> and . . . <u>Graham</u> . . . the Florida Legislature unanimously enacted legislation in 2014 designed to bring

See also Ex. DDD at 3-4 (brief on appeal in case number 5D16-2238, detailing the procedural history of Leppert's sentencing).

Also in accordance with Florida's new juvenile sentencing legislation, specifically section 775.082(1)(b), Leppert filed a motion seeking a jury determination of whether she "killed, intended to kill, or attempted to kill the victim." Ex. TT at 1.[6] Leppert's counsel explained in the motion that an affirmative factual finding on this issue would result in a minimum mandatory sentence of 40 years with a review after 25 years per subdivision (b)1., while a negative finding would dictate no minimum mandatory sentence with a review after 15 years per subdivision (b)2. See generally id. (citing Apprendi v. New Jersey, 530 U.S. 466 (2000); Alleyne v. United States, 570 U.S. 90 (2013)).

The trial court denied Leppert's request for a jury determination, Ex. UU, but conducted three hearings on the postconviction motions, including an evidentiary hearing, Ex. HH, Ex. SS at 4; Ex. ZZ at 4-6. The postconviction court ultimately denied Leppert's Rule 3.850 Motion following an evidentiary

---

Florida's juvenile sentencing statutes into compliance with the United States Supreme Court's . . . Eighth Amendment juvenile sentencing jurisprudence." Horsley v. State, 160 So. 3d 393, 394, 401 (Fla. 2015) (providing a thorough accounting of the enactment of chapter 2014-220, Laws of Florida, codified in sections 775.082, 921.1401, and 921.1402, Florida Statutes). "Section 921.1402 was enacted in 2014, while section 775.082 was simultaneously amended in 2014 to add subsection (1)(b)." Williams v. State, 278 So. 3d 262, 263 n.1 (Fla. 5th DCA 2019).

[6] The verdict form did not require the jury to make such a finding. Ex. M.

5

hearing. Ex. HH; Ex. II. The Fifth DCA per curiam affirmed without a written opinion, Ex. NN (case number 5D16-2795), and issued the mandate after denying Leppert's motion for rehearing, Ex. OO; Ex. PP; Ex. QQ.

The postconviction court, on the other hand, granted Leppert's Amended Rule 3.800(a) Motion (announced in open court and in a written order), finding that she was entitled to resentencing "according to the procedures set forth in Sections 921.1401, 921.1402, [and] 775.082." Ex. ZZ at 6-7; Ex. AAA at 2. The postconviction court also ruled both orally and in writing that the evidence "clear[ly]" established Leppert "intended to kill the victim, attempted to kill the victim, and in acting [sic] concert with Toby Lowry, did in fact kill the victim." Ex. ZZ at 9-10; Ex. BBB. The postconviction court resentenced Leppert to the same term of years as previously imposed on each conviction (life on the homicide conviction and concurrent terms of 50 years on the nonhomicide convictions) but with a "possibility of release after a review hearing after 25 years." Ex. ZZ at 10-11; Ex. CCC.[7]

Through counsel, Leppert appealed her resentencing. Ex. DDD (case number 5D16-2238). In a per curiam written opinion, the Fifth DCA reversed

---

[7] The postconviction court orally pronounced that Leppert would have a review hearing after 20 years on the robbery conviction, Ex. ZZ at 11, but the written judgment provided all three convictions would be subject to review after 25 years, Ex. CCC.

and remanded only so that the trial court could enter an amended sentencing order reflecting that Leppert was entitled to "a review of her robbery and burglary convictions after twenty years," not twenty-five years, per Florida Statutes section 921.1402(2)(d). Ex. HHH at 1-2. With respect to the sentence on the homicide conviction, the Fifth DCA concluded its decision in "a strikingly similar case" dictated affirmance but, as it did in that similar case (Williams v. State, 211 So. 3d 1070 (Fla. 5th DCA 2017)),[8] certified the following question of great public importance to the Florida Supreme Court:

> Does Alleyne v. United States[9] . . . require the jury and not the trial court to make the factual finding under section 775.082(1)(b), Florida Statutes (2016), as to whether a juvenile offender actually killed, intended to kill, or attempted to kill the victim?

Id. at 2-3. The Fifth DCA issued the mandate on May 11, 2017. Ex. III.

The Florida Supreme Court granted Leppert's petition for review, quashed the Fifth DCA's decision, and remanded the matter to the Fifth DCA for reconsideration in light of its recent decision answering the Fifth DCA's

---

[8] In the "strikingly similar" Williams case, the Fifth DCA held that a factual determination under section 775.082(b) could be made either by the trial judge or the jury. 211 So. 3d at 1073 (affirming the trial court's denial of the appellant's motion to empanel a jury).

[9] In Alleyne, the Supreme Court held, "Facts that increase the mandatory minimum sentence are . . . elements [of the crime] and must be submitted to the jury and found beyond a reasonable doubt." 570 U.S. at 108.

certified question in the affirmative. Ex. JJJ (citing <u>Williams v. State</u>, 242 So.

3d 280 (Fla. 2018)). In <u>Williams</u>, the Florida Supreme Court held:

> Because a finding of actual killing, intent to kill, or attempt to kill 'aggravates the legally prescribed range of allowable sentences,' <u>Alleyne</u>, 570 U.S. [at 115], by increasing the sentencing floor from zero to forty years and lengthening the time before which a juvenile offender is entitled to a sentence review from fifteen to twenty-five years, this finding is an 'element' of the offense, which <u>Alleyne</u> requires be submitted to a jury and found beyond a reasonable doubt.

242 So. 3d at 288.

The Fifth DCA subsequently withdrew its original opinion and mandate and issued a new opinion. Ex. KKK; Ex. LLL. The Fifth DCA affirmed on the claims not affected by the Florida Supreme Court's <u>Williams</u> decision (those on the nonhomicide sentences) but reversed the sentence imposed on the homicide conviction because the jury had not made a finding under Florida Statutes section 775.082(1)(b) whether Leppert "actually killed, intended to kill, or attempted to kill the victim," an error the Fifth DCA held was not harmless. Ex. LLL at 2-3. Accordingly, the court remanded the conviction on that charge for resentencing. <u>Id.</u> at 3. The court issued the mandate on August 6, 2018. Ex. MMM.

On remand in the trial court, Leppert filed a motion to declare Florida Statutes sections 921.1402(2)(b) and 775.082(1)(b)2. to be unconstitutional. Ex.

NNN. The trial court denied that motion. Ex. QQQ. However, in accordance with the Fifth DCA's remand order, the trial court resentenced Leppert on the homicide conviction pursuant to section 775.082(1)(b)2. Ex. OOO. The court again sentenced Leppert to a life term of imprisonment but with an opportunity for review after 15 years, per the statute. Id. The court entered a resentencing judgment on the homicide conviction (Count I) on January 14, 2019, nunc pro tunc to November 6, 2018. Ex. RRR.[10]

Proceeding through counsel, Leppert appealed. Ex. SSS (case number 5D19-274). The Fifth DCA per curiam affirmed, Ex. VVV, and on December 6, 2019, issued the mandate, Ex. WWW. Leppert sought review in the Florida Supreme Court. The court declined to accept jurisdiction and denied Leppert's petition for review. Ex. AAAA.

### III. One-Year Limitation Period

This action was timely filed within the one-year limitation period. See 28 U.S.C. § 2244(d).

---

[10] The January 14, 2019 resentencing judgment did not address the nonhomicide convictions, Counts II and III. See Ex. RRR. However, the trial court held a sentencing hearing on November 6, 2018, Ex. OOO, at which it appears Leppert was resentenced on those convictions with respect to the timing of her review hearings. See Ex. QQQ at 1 (January 14, 2019 trial court order denying Leppert's motion to declare the juvenile sentencing statutory provisions unconstitutional and noting Leppert's nonhomicide sentences were subject to review in 20 years). Respondents note in their Response that the November 6, 2018 resentencing hearing was never transcribed. See Response at 20.

## IV. Evidentiary Hearing

In a habeas corpus proceeding, the burden is on the petitioner to establish the need for a federal evidentiary hearing. See Chavez v. Sec'y, Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007); Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318-19 (11th Cir. 2016). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Schriro, 550 U.S. at 474. The pertinent facts of this case are fully developed in the record before the Court. Because the Court can "adequately assess [Leppert's] claim[s] without further factual development," Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003), an evidentiary hearing will not be conducted.

## V. Governing Legal Principles

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal petition for habeas corpus. See Ledford v. Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 642 (11th Cir.

2016), abrogation recognized on other grounds by Smith v. Comm'r, Ala. Dep't of Corr., 67 F.4th 1335, 1348 (11th Cir. 2023). "The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction." Id. (quoting Greene v. Fisher, 565 U.S. 34, 38 (2011)). As such, federal habeas review of final state court decisions is "greatly circumscribed and highly deferential." Id. (quotation marks omitted) (quoting Hill v. Humphrey, 662 F.3d 1335, 1343 (11th Cir. 2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the claim on the merits. See Marshall v. Sec'y, Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue a written opinion explaining its rationale in order for the state court's decision to qualify as an adjudication on the merits. See Harrington v. Richter, 562 U.S. 86, 100 (2011). Where the state court's adjudication on the merits is unaccompanied by an explanation, the United States Supreme Court has instructed:

> [T]he federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.

Wilson v. Sellers, 584 U.S. 122, 125 (2018). The presumption may be rebutted by showing that the higher state court's adjudication most likely relied on different grounds than the lower state court's reasoned decision, such as persuasive alternative grounds that were briefed or argued to the higher court or obvious in the record it reviewed. Id. at 125-26, 132.

If the claim was "adjudicated on the merits" in state court, § 2254(d) bars relitigation of the claim unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Richter, 562 U.S. at 97-98. The Eleventh Circuit describes the limited scope of federal review pursuant to § 2254 as follows:

> First, § 2254(d)(1) provides for federal review for claims of state courts' erroneous legal conclusions. As explained by the Supreme Court in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L.Ed.2d 389 (2000), § 2254(d)(1) consists of two distinct clauses: a "contrary to" clause and an "unreasonable application" clause. The "contrary to" clause allows for relief only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 413, 120 S. Ct. at 1523 (plurality opinion). The "unreasonable application" clause allows for relief only "if the state court identifies

the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id.

Second, § 2254(d)(2) provides for federal review for claims of state courts' erroneous factual determinations. Section 2254(d)(2) allows federal courts to grant relief only if the state court's denial of the petitioner's claim "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has not yet defined § 2254(d)(2)'s "precise relationship" to § 2254(e)(1), which imposes a burden on the petitioner to rebut the state court's factual findings "by clear and convincing evidence." See Burt v. Titlow, 571 U.S. ---, ---, 134 S. Ct. 10, 15, 187 L.Ed.2d 348 (2013); accord Brumfield v. Cain, 576 U.S. ---, ---, 135 S. Ct. 2269, 2282, 192 L.Ed.2d 356 (2015). Whatever that "precise relationship" may be, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'"[11] Titlow, 571 U.S. at ---, 134 S. Ct. at 15 (quoting Wood v. Allen, 558 U.S. 290, 301, 130 S. Ct. 841, 849, 175 L.Ed.2d 738 (2010)).

Tharpe v. Warden, 834 F.3d 1323, 1337 (11th Cir. 2016). Also, deferential review under § 2254(d) generally is limited to the record before the state court that adjudicated the claim on the merits. See Cullen v. Pinholster, 563 U.S.

---

[11] The Eleventh Circuit has described the interaction between § 2254(d)(2) and § 2254(e)(1) as "somewhat murky." Clark v. Att'y Gen., Fla., 821 F.3d 1270, 1286 n.3 (11th Cir. 2016).

13

170, 182 (2011) (stating the language in § 2254(d)(1) "requires an examination of the state-court decision at the time it was made").

Thus, "AEDPA erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Titlow, 571 U.S. at 19. "Federal courts may grant habeas relief only when a state court blundered in a manner so 'well understood and comprehended in existing law' and 'was so lacking in justification' that 'there is no possibility fairminded jurists could disagree.'" Tharpe, 834 F.3d at 1338 (quoting Richter, 562 U.S. at 102-03). This standard is "meant to be" a "difficult" one to meet. Richter, 562 U.S. at 102. Thus, to the extent that the petitioner's claims were adjudicated on the merits in the state courts, they must be evaluated under 28 U.S.C. § 2254(d).

## B. Exhaustion/Procedural Default

There are prerequisites to federal habeas review. Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies that are available for challenging his state conviction. See 28 U.S.C. § 2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. Castille v. Peoples, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust a claim, "state

14

prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).

In addressing exhaustion, the United States Supreme Court explained:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the "''opportunity to pass upon and correct" alleged violations of its prisoners' federal rights.'" Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L.Ed.2d 438 (1971)). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim. Duncan, supra, at 365–366, 115 S. Ct. 887; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L.Ed.2d 1 (1999).

Baldwin v. Reese, 541 U.S. 27, 29 (2004).

A state prisoner's failure to properly exhaust available state remedies results in a procedural default which raises a potential bar to federal habeas review. The United States Supreme Court has explained the doctrine of procedural default as follows:

> Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our

15

> system of federalism. These rules include the doctrine of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. <u>See</u>, <u>e.g.</u>, <u>Coleman</u>,[12] <u>supra</u>, at 747–748, 111 S. Ct. 2546; <u>Sykes</u>,[13] <u>supra</u>, at 84–85, 97 S. Ct. 2497. A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. <u>See</u>, <u>e.g.</u>, <u>Walker v. Martin</u>, 562 U.S. --, --, 131 S. Ct. 1120, 1127–1128, 179 L.Ed.2d 62 (2011); <u>Beard v. Kindler</u>, 558 U.S. --, --, 130 S. Ct. 612, 617–618, 175 L.Ed.2d 417 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law. <u>See</u> <u>Coleman</u>, 501 U.S., at 750, 111 S. Ct. 2546.

<u>Martinez v. Ryan</u>, 566 U.S. 1, 9-10 (2012). Thus, procedural defaults may be excused under certain circumstances. Notwithstanding that a claim has been procedurally defaulted, a federal court may still consider the claim if a state habeas petitioner can show either (1) cause for and actual prejudice from the default; or (2) a fundamental miscarriage of justice. <u>Ward v. Hall</u>, 592 F.3d 1144, 1157 (11th Cir. 2010). In order for a petitioner to establish cause,

---

[12] <u>Coleman v. Thompson</u>, 501 U.S. 722 (1991).

[13] <u>Wainwright v. Sykes</u>, 433 U.S. 72 (1977).

> the procedural default "must result from some
> objective factor external to the defense that prevented
> [him] from raising the claim and which cannot be
> fairly attributable to his own conduct." <u>McCoy v.
> Newsome</u>, 953 F.2d 1252, 1258 (11th Cir. 1992)
> (quoting <u>Carrier</u>, 477 U.S. at 488, 106 S. Ct. 2639).[14]
> Under the prejudice prong, [a petitioner] must show
> that "the errors at trial actually and substantially
> disadvantaged his defense so that he was denied
> fundamental fairness." <u>Id</u>. at 1261 (quoting <u>Carrier</u>,
> 477 U.S. at 494, 106 S. Ct. 2639).

<u>Wright v. Hopper</u>, 169 F.3d 695, 706 (11th Cir. 1999).

In the absence of a showing of cause and prejudice, a petitioner may receive consideration on the merits of a procedurally defaulted claim if the petitioner can establish that a fundamental miscarriage of justice, the continued incarceration of one who is actually innocent, otherwise would result. <u>Ward</u>, 592 F.3d at 1157. The Eleventh Circuit has explained:

> [I]f a petitioner cannot show cause and prejudice,
> there remains yet another avenue for him to receive
> consideration on the merits of his procedurally
> defaulted claim. "[I]n an extraordinary case, where a
> constitutional violation has probably resulted in the
> conviction of one who is actually innocent, a federal
> habeas court may grant the writ even in the absence
> of a showing of cause for the procedural default."
> <u>Carrier</u>, 477 U.S. at 496, 106 S. Ct. at 2649. "This
> exception is exceedingly narrow in scope," however,
> and requires proof of actual innocence, not just legal
> innocence. <u>Johnson v. Alabama</u>, 256 F.3d 1156, 1171
> (11th Cir. 2001).

---

[14] <u>Murray v. Carrier</u>, 477 U.S. 478 (1986).

Id. "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001) (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." Calderon v. Thompson, 523 U.S. 538, 559 (1998) (quoting Schlup, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. Schlup, 513 U.S. at 324.

### C. Ineffective Assistance of Trial Counsel

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. That right is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (first citing Wiggins v. Smith, 539 U.S. 510, 521 (2003); and then Strickland v. Washington, 466 U.S. 668, 687 (1984)).

> To establish deficient performance, a person challenging a conviction must show that "counsel's representation fell below an objective standard of reasonableness." [Strickland,] 466 U.S. at 688, 104 S. Ct. 2052. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. Id., at 689, 104 S. Ct. 2052. The challenger's burden is to show "that counsel made errors so serious that counsel was not

> functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id., at 687, 104 S. Ct. 2052.
>
> With respect to prejudice, a challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id., at 694, 104 S. Ct. 2052. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Id., at 693, 104 S. Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id., at 687, 104 S. Ct. 2052.

Richter, 562 U.S. at 104. The Eleventh Circuit has recognized "the absence of any iron-clad rule requiring a court to tackle one prong of the Strickland test before the other." Ward, 592 F.3d at 1163. Since both prongs of the two-part Strickland test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Id. (citing Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in Strickland: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Strickland, 466 U.S. at 697.

A state court's adjudication of an ineffectiveness claim is accorded great deference.

> "[T]he standard for judging counsel's representation is a most deferential one." <u>Richter</u>, 562 U.S. at ---, 131 S. Ct. at 788. But "[e]stablishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." <u>Id.</u> (citations and quotation marks omitted). "The question is not whether a federal court believes the state court's determination under the <u>Strickland</u> standard was incorrect but whether that determination was unreasonable — a substantially higher threshold." <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123, 129 S. Ct. 1411, 1420, 173 L.Ed.2d 251 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard," then a federal court may not disturb a state-court decision denying the claim. <u>Richter</u>, 562 U.S. at ---, 131 S. Ct. at 788.

<u>Hittson v. GDCP Warden</u>, 759 F.3d 1210, 1248 (11th Cir. 2014); <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 123 (2009). In other words, "[i]n addition to the deference to counsel's performance mandated by <u>Strickland</u>, the AEDPA adds another layer of deference—this one to a state court's decision—when [courts] are considering whether to grant federal habeas relief from a state court's decision." <u>Rutherford v. Crosby</u>, 385 F.3d 1300, 1309 (11th Cir. 2004). As such, "[s]urmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010).

## VI. Findings of Fact and Conclusions of Law

### A. Ground One

As Ground One, Leppert alleges "the timing of the review hearings contained in Sections 775.082(1)(b)[2.] and 921.1402(2)(d), Florida Statutes, are unconstitutional [because] the statutes fail to graduate and proportionate the punishment to the offense and fail to offer a meaningful opportunity for release" in violation of <u>Graham</u>. Pet. Memo. at 1, 3. Respondents counter that this claim is unexhausted and procedurally defaulted because Leppert did not raise the claim in the state court in a procedurally correct manner. Response at 29-30. In doing so, they acknowledge Leppert raised the claim in the trial court through her motion to declare statutory provisions unconstitutional, but only after the Florida Supreme Court granted her petition for review and remanded the case for reconsideration in Fifth DCA case number 5D16-2238. <u>Id.</u> at 27.

Leppert argues in her Reply that she properly exhausted her state remedies because she raised this claim in the trial court, which addressed it on the merits. Reply at 1. She further suggests her claim was not ripe when her case was before the Florida Supreme Court because it was not until the Fifth DCA reconsidered her homicide sentence on remand that she became "eligible

for punishment under Section 775.082(1)(b)[2.]"[15] Id. at 2-4. Finally, she asserts that to the extent the Fifth DCA denied her appeal as procedurally barred, the procedural bar "was applied in an arbitrary or unprecedented fashion, and/or was applied in a manifestly unfair manner." Id.

Upon review, it appears this claim is unexhausted for the reasons Respondents advance. The Florida Supreme Court instructed the Fifth DCA in case number 5D16-2238 to reconsider its ruling regarding Leppert's homicide sentence and, in accordance with that instruction, the Fifth DCA in turn remanded the case to the trial court for resentencing. Ex. JJJ; Ex. LLL. In its opinion, the Fifth DCA stated in pertinent part:

> In the case at hand, the jury was instructed on first-degree premeditated murder and first-degree felony murder with burglary or robbery as the underlying felony. The verdict form did not require the jury to specify under which theory it found Leppert guilty. Based upon a similar fact pattern, the Florida Supreme Court determined in Williams that there was no clear jury finding that the defendant actually killed, intended to kill, or attempted to kill the victim and that the error was not harmless. 242 So. 3d at 289, 291. The court further held that "[w]here the error cannot be deemed harmless, the proper remedy is to resentence the juvenile offender pursuant to section 775.082(1)(b)2., Florida Statutes (2016)." Id. at 282.

---

[15] Section 775.082(1)(b)2. addresses sentencing for those who "did not actually kill, intend to kill, or attempt to kill the victim," whereas subdivision (1)(b)1. of that section—under which Leppert had been resentenced before remand—is the provision that addresses sentencing for those who "actually killed, intended to kill, or attempted to kill the victim." See Fla. Stat. § 775.082(1)(b)1., 2. (emphasis added).

> Because we conclude that the error was not harmless, we reverse the sentence imposed for the murder conviction and remand for Leppert to be resentenced on that charge pursuant to section 775.082(1)(b)2.

Ex. LLL at 2-3.

Leppert raised a constitutional challenge for the first time on remand from Fifth DCA case number 5D16-2238, even though she argued to the Fifth DCA in that appeal that resentencing under subdivision (1)(b)2. of section 775.082 was the preferred or appropriate course of action. Ex. DDD at 34 (arguing the trial court "reversibly erred by making the factual determination that [Leppert] actually killed or intended to kill the victim, rather than either (a) empaneling a jury . . . or (b) . . . sentencing [Leppert] under Section 775.082(1)(b)[2.]"). She did not assert a constitutional challenge to the timing of the review periods to which she would have been entitled if she were to be resentenced in accordance with her request: under section 775.082(1)(b)2. on the homicide conviction, with a review after 25 years; and under section 921.1402(2)(d) on the nonhomicide convictions, with a review after 20 years. See id.[16]

---

[16] Notably, after Florida's juvenile sentencing scheme was enacted, Leppert consistently requested in the trial court to be resentenced on the homicide conviction under section 775.082(1)(b)2. because the jury had not made a finding that she "actually killed, intended to kill, or attempted to kill the victim." Ex. TT (motion to empanel a jury and for resentencing); Ex. VV (Amended Rule 3.800(a) Motion).

In its answer brief on appeal from the denial of Leppert's motion to declare statutory provisions unconstitutional (case number 5D19-0274), the state argued Leppert's Eighth Amendment claim was both "unpreserved and meritless." Ex. TTT at 5. According to the state, the claim was unpreserved because Leppert did not raise a constitutional challenge to the juvenile sentencing scheme in the Florida Supreme Court. Id. at 6, 9. As such, the state argued, the Fifth DCA lacked the authority to "modify, nullify, or evade [the Supreme Court's] mandate," which directed that the Fifth DCA reconsider its opinion on Leppert's sentence in light of its Williams decision. Id. at 8. The state contended, "[I]t is not this Court's or the trial court's place to depart from the sentencing framework explicitly ordered by the Florida Supreme Court, or to declare its remand order unconstitutional." Id. at 9.

In affirming the postconviction court's ruling, the Fifth DCA appears to have accepted the state's procedural bar argument, citing two district court of appeal opinions: Williams v. State, 278 So. 3d 262 (Fla. 5th DCA 2019); and Copeland v. State, 240 So. 3d 58 (Fla. 1st DCA 2018). Ex. VVV. In each opinion, the respective appellate court found the appellant's failure to challenge the constitutionality of the juvenile sentencing statutes in the Florida Supreme Court meant that neither the district court of appeal nor the trial court could deviate from or exceed the bounds of the Supreme Court's instruction. See

Copeland, 240 So. 3d at 60; Williams, 278 So. 3d at 267. Indeed, in Copeland, the First DCA rejected the appellant's argument that section 921.1402(2)(a) was unconstitutional because "the Florida Supreme Court issued explicit instructions to the trial court that it resentence [the appellant] 'in conformance with the framework established in . . . sections 775.082, 921.1401, and 921.1402 of the Florida Statutes.'" 240 So. 3d at 60. The court reasoned as follows:

> If [the appellant] had a constitutional problem with being resentenced under this framework with its sentence-review prohibition, he should have argued that point to the Florida Supreme Court before it remanded his case. Now, on remand, it is hardly this court's or the trial court's place to depart from the sentencing framework explicitly ordered by the Florida Supreme Court, or to declare its remand order unconstitutional.

Id. And, in Williams, relying on the reasoning in Copeland, the Fifth DCA "declined to pass on the constitutionality of [the juvenile sentencing] statutes" because the Florida Supreme Court had already mandated the appellant "was entitled to resentencing under section 775.082(1)(b)2.," and the appellant did not raise "constitutional concerns with being resentenced under [the] statute" in the Florida Supreme Court. 278 So. 3d at 267. As such, the court affirmed the appellant's sentences because the appellant "[was] essentially requesting

that the [DCA] determine the Florida Supreme Court's earlier remand order to be unconstitutional, which [the DCA had] no authority to do." Id. at 268.

Here, in affirming the trial court's order, the Fifth DCA relied upon a procedural bar that was firmly established and regularly followed: that lower courts "lack authority to deviate from an appellate court's mandate." See Copeland, 240 So. 3d at 60; Williams, 278 So. 3d at 268 (both citing Blackhawk Heating & Plumbing Co. v. Data Lease Fin. Corp., 328 So. 2d 825, 827 (Fla. 1975)). Because the Fifth DCA affirmed the trial court's order on a procedural bar that was firmly established and regularly followed, Ground One is unexhausted and procedurally defaulted. Leppert has failed to demonstrate either cause or prejudice to excuse her failure to exhaust and also has failed to demonstrate that a fundamental miscarriage of justice has occurred.

However, assuming arguendo Leppert properly exhausted this claim, it is without merit for the reasons stated by the trial court and in the state's answer brief on appeal in Fifth DCA case number 5D19-0274. In denying Leppert's motion challenging the constitutionality of the juvenile sentencing scheme under which she was resentenced, the trial court determined the relevant statutory provisions comply with the Supreme Court's dictates. Ex. QQQ at 2. The court concluded in pertinent part:

> After review, the Court agrees that neither Graham [n]or Miller requires review hearings after 15,

26

20, or 25 years. They only require the State to afford juveniles some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation. <u>Graham</u>, 560 U.S. [at 75]. They also do not require that States afford opportunities for release at the same time for different crimes. Based on Defendant's current sentence, she will be eligible for a review hearing on her First Degree Murder conviction at 31 years of age and for her Burglary and Robbery convictions at 36 years of age. Defendant will be afforded a meaningful opportunity during her lifetime for an early release, which satisfies the Eighth Amendment. To the extent that the juvenile resentencing statute provides for different periods of time for review hearings, those are rationally related to the varying levels of crimes for which a defendant has been convicted.

<u>Id.</u>

In its answer brief on appeal, the state argued in pertinent part as follows:

As recognized in <u>Graham v. Florida</u>, 560 U.S. 48 (2010), and <u>Miller v. Alabama</u>, 567 U.S. 460 (2012), the prohibition against cruel and unusual punishment should be graduated and proportioned to the offender and the offense, and in the context of juvenile offenders, that means that juvenile offenders must be provided a meaningful opportunity for review and courts must consider mitigating evidence of youth and immaturity when sentencing juvenile offenders. The statutes Appellant is challenging do just that.

Despite the confusion in the motion, juvenile non-homicide offenders are eligible for judicial review after 20 years, and for a second opportunity ten years after that if they are denied release the first time around. <u>See</u> § 921.1402(2)(d), Fla. Stat. Juvenile

27

homicide offenders who did not actually kill, intend to kill, or attempt to kill the murder victim are eligible for a single opportunity for judicial review after 15 years. See § 921.1402(2)(c), Fla. Stat. Finally, juvenile homicide offenders who actually killed, intended to kill, or attempted to kill the murder victim are eligible for a single chance at judicial review after 25 years. See § 921.1402(2)(b), Fla. Stat. Upon consideration of the "gravity of the offense and the harshness of the penalty," Wiley v. State, 125 So. 3d 235, 240 (Fla. 4th DCA 2013) (quoting Andrews v. State, 82 So. 3d 979, 984 (Fla. 1st DCA 2011)), the trial court correctly denied the motion as the judicial review provisions are not grossly disproportionate to the crime or so excessive as to shock the judicial conscience. Cf. Booker v. State, 514 So. 2d 1079, 1085 (Fla. 1987) (explaining that it would be an abuse of discretion to impose an upward departure sentence under the 1987 sentencing guidelines if the sentence was "so excessive as to shock the judicial conscience"). See also Montgomery v. Louisiana, 136 S. Ct. 718, 736 (2016) ("A State may remedy a Miller violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them. Allowing those offenders to be considered for parole ensures that juveniles whose crimes reflected only transient immaturity—and who have since matured—will not be forced to serve a disproportionate sentence in violation of the Eighth Amendment."); Landrum v. State, 192 So. 3d 459, 460-61 (Fla. 2016) (Landrum's non-mandatory life sentence without the possibility of parole reversed and remanded for resentencing under the 2014 juvenile sentencing legislation where supreme court explained "that Landrum's sentence is unconstitutional is also compelled by the 'precept of justice that punishment for crime should be graduated and proportioned to [the] offense.' Upholding Landrum's sentence would violate this precept, as a juvenile convicted of the lesser offense of second-

28

> degree murder would receive a harsher sentence than
> a juvenile convicted of first-degree murder.").

Ex. TTT at 11-13. For the reasons stated, relief on the claim in Ground One is due to be denied.

## B. Ground Two

As Ground Two, Leppert alleges her 50-year sentences for the nonhomicide convictions are unconstitutional under <u>Graham</u> as <u>de</u> <u>facto</u> life sentences given her life expectancy and "taking into account the harshness of prison life." Petition at 7; Pet. Memo. at 5-9; Reply at 7. Leppert raised this claim on appeal after she was resentenced in 2016. Ex. AAA; Ex. CCC; Ex. DDD. In its answer brief on appeal, the state argued Leppert's sentences were constitutional under <u>Graham</u> in that they complied with Florida's juvenile sentencing scheme. Ex. EEE at 24-25. The state explained:

> Here, of course, Appellant has been resentenced pursuant to the new juvenile sentencing legislation. Counts II and III [burglary and robbery], both first degree felonies punishable by life, qualify as convictions for "an offense that is not included in s. 782.04 but that is an offense that is a life felony or by a term of years not exceeding life imprisonment[.]" § 775.082(3)(c). Under that provision, a juvenile who is sentenced upon a conviction for a first degree felony punishable by life and is sentenced to a term of more than 20 years is entitled to a review in 20 years in accordance with section 921.1402(2)(d). <u>See</u> § 775.082(3)(c), Fla. Stat. (2014). And, under section 921.1402(2)(d), Florida Statutes, (2014), a juvenile whose sentence is not modified at the initial review

> hearing is eligible for a second review hearing 10 years after the first. Thus, Appellant will get a review of all three sentences (not just counts II and III) where she will have a meaningful opportunity to demonstrate maturity and rehabilitation. As the Supreme Court explained in <u>Graham</u>, 130 S. Ct. at 2034, "a State need not guarantee eventual freedom" for a juvenile, so long as it provides a "meaningful opportunity to demonstrate maturity and rehabilitation[;]" Appellant's sentences in counts II and III imposed under the new legislation are constitutional sentences. <u>See</u> <u>Peterson [v. State</u>, 193 So. 3d 1034 (Fla. 5th DCA 2016)], <u>supra.</u> Appellant is entitled to no relief.

<u>Id.</u> at 25-26.

The Fifth DCA per curiam affirmed Leppert's 50-year sentences without a written opinion. Ex. HHH at 2. To the extent the Fifth DCA decided the claim on the merits,[17] the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Thus, Leppert is not entitled to relief on the claim in Ground Two.

---

[17] Throughout this Order, in looking through the appellate court's per curiam affirmance to the circuit court's "relevant rationale," the Court presumes that the appellate court "adopted the same reasoning." <u>Wilson</u>, 584 U.S. at 125.

Even if the state court's adjudication of the claim was not entitled to deference, Leppert's claim is without merit. Leppert suggests her 50-year sentences are unconstitutional under <u>Graham</u>. <u>See</u> Pet. Memo. at 8-9. In <u>Graham</u>, the Supreme Court held a life without parole sentence for a nonhomicide conviction is unconstitutional because it deprives the offender of a future "chance to demonstrate growth and maturity." 560 U.S. at 73, 75. But the Court did not hold a life sentence or a <u>de facto</u> life sentence on a nonhomicide conviction is categorically barred. <u>Id.</u> Rather, such a sentence is constitutional so long as the defendant is afforded "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." <u>See id.</u> at 75. Indeed, the Court emphasized that "the Eighth Amendment . . . does not require [a] [s]tate to release [a juvenile] offender during [her] natural life," nor is a state "required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime." <u>Id.</u> The Court left it to the individual states "to explore the means and mechanisms for compliance" with its holding. <u>Id.</u>

Florida's mechanism for complying with <u>Graham</u>'s holding is set forth in the juvenile sentencing scheme under which Leppert was resentenced. <u>See</u> <u>Horsley</u>, 160 So. 3d at 398 (explaining the Florida Legislature, in enacting the juvenile sentencing scheme, was responding directly to the Supreme Court's

recognition that "youth matters in determining the appropriateness of a lifetime of incarceration without the possibility of parole," as acknowledged first in Graham and later in Miller). In 2016, the resentencing court applied Florida Statutes section 921.1401 by holding an individualized sentencing hearing to determine whether a sentence of life in prison or a term of years equal to life imprisonment was an appropriate sentence for Leppert, an offender who was only 15 years old when she committed the crimes. Ex. ZZ at 4, 9-10, 12. The court made findings relevant to Leppert's age and the attendant circumstances in accordance with section 921.1401(2)(a)-(j) after hearing relevant evidence. Id. at 13-14. See also Ex. AAA. That evidence included testimony from Dr. Stephen Bloomfield, a licensed psychologist, who testified that in 2008, the Centers for Disease Control predicted a 66.5-year life expectancy for a 15-year-old Caucasian female, and he did not predict Leppert would live beyond that age if imprisoned the entire time. Ex. HH at 34, 65-66.

In short, Leppert's sentences on the burglary and robbery convictions do not violate the Eighth Amendment as interpreted in Graham. She was sentenced under Florida's juvenile sentencing scheme, and her sentences will be reviewed at the statutorily prescribed times. As Graham requires, the state sentenced Leppert in a manner that affords her a "meaningful opportunity to obtain [early] release based on demonstrated maturity and rehabilitation." See

560 U.S. at 75. Accordingly, she is not entitled to relief on the claim in Ground Two.

## C. Ground Three

As Ground Three, Leppert alleges her pretrial counsel deprived her of due process under the Fifth Amendment and the effective assistance of counsel under the Sixth Amendment by permitting authorities to question her when she was detained in Texas without a parent or an attorney present even though she was only 15 years old. Petition at 8; Pet. Memo. at 9. Leppert raised this claim in her counseled Rule 3.850 Motion. Ex. FF at 4. The postconviction court held an evidentiary hearing at which Leppert's pretrial counsel, Teresa Sopp, testified, as did Leppert's mother. Ex. HH at 3.

In denying Leppert relief on this claim, the postconviction court accurately set forth the <u>Strickland</u> standard and found as follows:

> Collateral Counsel for Defendant argues that objectively, it was clear that Defendant would be a suspect in the investigation of the victim's death because she was found in possession of the victim's vehicle; and subjectively, Sopp should have understood that detectives were holding Defendant there (in El Paso) or that she was in custody there on probable cause for a criminal offense. Collateral Counsel for Defendant argues that Sopp made no effort to travel to Texas to accompany Defendant during the interview, did not advise Defendant's Mother to retain local Counsel in El Paso, and did not seek to have a Public Defender appointed in Texas. Further [sic] Sopp made no effort to engage in any plea

bargain negotiations with prosecutors in exchange for Sopp granting investigators access to Defendant.

However, the testimony showed that after Defendant's mother retained Teresa Sopp in Florida, Sopp spoke to Defendant before allowing her to speak to detectives. Defendant told Ms. Sopp that she was unknowing of the murder, that Toby Lowry had picked her up in the victim's truck, and that she did not know where he had gotten it. Based on that version of the facts, which the Defendant later admitted was a lie, Sopp gave consent for an interview. Sopp testified that she signed an authorization form provided by the juvenile authorities in El Paso, consenting to an interview by a Putnam County Detective regarding "only her [Morgan's] role as a victim of crime. No statements will be used in any prosecution against Morgan." Unknown to Sopp, Defendant twice waived Sopp's further involvement after being advised of her Miranda [sic] rights. Defendant specifically acknowledged to the Putnam County Detective that she had spoken with Ms. Sopp who "let me know not to tell you anything." As the State points out: to waive the presence and advice of an attorney is the right of any criminal defendant. An attorney cannot exercise those particular rights for a client. The waiver was found to be valid by the trial judge after testimony and arguments on Defendant's Motions to Suppress and Motion to Enforce Immunity Agreement.

Under the circumstances, and noting Sopp's brief involvement, neither prong of <u>Strickland</u> has been met.

Ex. II at 2-4 (internal record citations omitted). The Fifth DCA per curiam affirmed the denial of relief without a written opinion. Ex. NN.

To the extent the Fifth DCA decided the claim on the merits, the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Thus, Leppert is not entitled to relief on the basis of this ineffectiveness claim.

Even if the appellate court's adjudication of the claim was not entitled to deference, Leppert's ineffectiveness claim fails. At the evidentiary hearing on Leppert's postconviction motions, Ms. Sopp explained that Leppert's mother, Geraldine (Gerry) Leppert, contacted her on Sunday May 4, 2008, explaining that her daughter had been reported missing and was found in Texas but was being held there by authorities. Ex. HH at 116-18. According to Ms. Sopp, Gerry Leppert wanted Ms. Sopp's assistance "to find out what the status was and why [authorities] were holding her daughter." Id. at 117. Ms. Sopp contacted local authorities and learned that Leppert "was taken into custody with a person who was suspected of a homicide . . . ." Id. She refused to permit

authorities to speak with Leppert until she herself had spoken with her client. Id. at 126.

Ms. Sopp called the juvenile detention center where Leppert was being held and eventually was able to speak with Leppert, who denied any involvement in the homicide, saying she had not been with Lowry at the time. Id. at 117. Thereafter, believing Leppert was a "missing person or a victim or a witness," not a suspect in a homicide investigation, Ms. Sopp permitted authorities to speak with Leppert. Id. at 117-18.[18] However, before granting detectives access to Leppert, staff at the detention center asked Ms. Sopp to execute a "Legal Consent Form," which she did. Id. at 118. See also Ex. G. On the form, Ms. Sopp wrote that she was giving consent for law enforcement officials to "meet with [her] client, Morgan Lep[p]ert . . . only [in] her role as a victim of [a] crime [and that] [n]o statements [made by Leppert would] be used in any prosecution against [her]." Ex. G. See also Ex. HH at 119.

---

[18] An investigator with the Putnam County State Attorney's Office had already interviewed Leppert once, on May 3, 2008, the day Leppert initially was detained and before Ms. Sopp was retained. Ex. K at 537-38. During that first interview, Leppert told the investigator essentially what she told Ms. Sopp—that Lowry picked her up in the victim's truck when what would have been after the murder, and she did not know where Lowry got the truck. Id. at 561, 567. The investigator who interviewed Leppert on May 3, 2008, believed she was a runaway, not a murder suspect. Id. at 537. That same investigator participated in the May 5, 2008 interview, conducted primarily by a detective with the Putnam County Sheriff's Office, and observed by a detective with the El Paso Police Department. Id. at 515-16, 666-67, 678.

Ms. Sopp testified that she believed the detectives who interviewed Leppert were apprised of the consent form, which she faxed to the detention center, because it was her understanding the detectives were "inside the detention center" waiting for clearance from her to gain access to Leppert. Ex. HH at 120. Ms. Sopp conceded that, in hindsight, she "probably should have waited and found out that there was a public defender . . . already appointed [for Leppert in Texas]," but she believed she had reached a verbal "immunity agreement" with the Putnam County State Attorney's Office that Leppert was to be questioned solely as a victim or witness, not a suspect. Id. at 120-21, 128.[19]

Although Ms. Sopp expressed at the evidentiary hearing that perhaps, in retrospect, she should have made a different decision in the moment, the reasonableness of her advice and decision-making must be assessed without "the distorting effects of hindsight." See Strickland, 466 U.S. at 689. Instead, they must be assessed from her "perspective at the time." Id. As Strickland instructs, in assessing whether an attorney's performance was reasonable, a court must consider all the circumstances, including the information the attorney received from the client. Id. at 688-90.

---

[19] The trial court denied Leppert's pretrial motions to suppress and to enforce an immunity agreement. Ex. J.

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.

Id. at 691. See also Newland v. Hall, 527 F.3d 1162, 1202 (11th Cir. 2008) ("In evaluating the reasonableness of a defense attorney's [strategy], we weigh heavily the information provided by the defendant.").

Leppert told Ms. Sopp information that led Ms. Sopp to believe Leppert had nothing to do with the murder but rather was a witness or a victim of Lowry's. Sopp made decisions based on that important information. Given what Ms. Sopp was told by her client, by Gerry Leppert, and by prosecuting/investigating officials, she cannot be said to have been deficient under the Strickland standard for permitting Leppert to be interviewed without an attorney or a parent present on May 5, 2008. Accordingly, Leppert is not entitled to relief on the claim in Ground Three.

### D. Ground Four

As Ground Four, Leppert alleges trial counsel was ineffective when he failed to introduce evidence supporting her sole defense theory: infancy. Petition at 10; Pet. Memo. at 16. According to Leppert, both Dr. Bloomfield and Leppert's mother "would have testified [to] her infancy," but counsel chose not

to call them at trial, which resulted in the trial court denying counsel's request

for a special jury instruction proposed as follows in pertinent part:

> [I]f you determine that the defendant because of her
> age or maturity lacked the mental ability to form the
> specific intent to commit [the] crimes [with which she
> is charged], you must find the defendant not guilty of
> any offense containing the specific intent element.

Pet. Memo. at 16-18 (capitalization omitted). See also Ex. K at 842. Leppert

raised this claim in her counseled Rule 3.850 Motion. Ex. FF at 9. In denying

relief on the claim, the postconviction court found neither prong of Strickland

established:

> At the [evidentiary] hearing, Trial Counsel
> testified that he consulted with Dr. Bloomfield on the
> infancy matter about a month before trial and made
> the determination that Dr. Bloomfield's testimony
> simply would not be helpful. Trial Counsel elicited all
> available testimony from other sources throughout the
> trial in an attempt to get that instruction, to no avail.
> Trial Counsel was able to emphasize to the jury
> Defendant's lack of maturity, through the cross
> examination of witnesses and by playing at least two
> hours of videotapes of Defendant. The Court finds it
> unlikely that a jury instruction on infancy would have
> altered the outcome of the trial. A review of the record
> shows that neither prong of Strickland has been met
> here.

Ex. II at 4. The Fifth DCA per curiam affirmed the denial of relief without a

written opinion. Ex. NN.

To the extent the Fifth DCA decided the claim on the merits, the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Thus, Leppert is not entitled to relief on the basis of this ineffectiveness claim.

Even if the appellate court's adjudication of the claim was not entitled to deference, Leppert's ineffectiveness claim is without merit. At the evidentiary hearing on Leppert's postconviction motions, her trial counsel, Christopher Smith, testified that he arranged for Dr. Bloomfield to evaluate Leppert before trial. Ex. HH at 139. According to Mr. Smith, he himself perceived that Leppert's recorded interviews showed she "was not sophisticated and old enough to appreciate what was going on." Id. In his mind, he explained, Leppert "was not as sophisticated as most 15 years olds [in that she] was very emotionally and physically immature." Id. at 140. However, Mr. Smith ultimately decided not to call Dr. Bloomfield as a witness, concluding after speaking with the doctor that his expert testimony would not be helpful. Id. at

140-42. Mr. Smith also decided not to call Gerry Leppert as a witness because he "didn't want to put her through it." Id. at 142.

Mr. Smith's informed decisions on matters of trial strategy, including whether to call particular witnesses, are entitled to deference. See Strickland, 466 U.S. at 690 ("[A] court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."). Even if a different trial attorney would have made different decisions, considering the record, the Court cannot conclude that Mr. Smith's performance "fell below an objective standard of reasonableness." Id. at 688, 690.

Assuming arguendo that Mr. Smith was deficient for failing to introduce evidence supporting the infancy instruction, any such deficiency did not prejudice Leppert's defense. Neither Gerry Leppert nor Dr. Bloomfield would have testified that Leppert "lacked the mental ability to form the specific intent to commit [the] crimes [charged]" simply because of her age. See Ex. K at 842. According to the testimony offered at Leppert's postconviction hearing, Gerry Leppert would have testified that her daughter was a "social butterfly" who had a learning disability and was "very immature," lacking in "common sense."

Ex. HH at 17, 21.[20] However, Gerry Leppert also said that, with her permission, her daughter started taking birth control at age 13 and had a live-in 17-year-old boyfriend when she was only 14 years old. Id. at 16-18.[21] Gerry Leppert, as a lay witness, would not have been able to tell the jury that Leppert was so immature that she lacked the mental ability to form intent under the law. See id.

Dr. Bloomfield also could not have offered an expert opinion along those lines. Dr. Bloomfield evaluated Leppert before her trial, in 2008 and 2009. Id. at 39.[22] At that time, according to Dr. Bloomfield, Leppert "obviously . . . presented as a child": she was immature, dependent, submissive, suggestible, and unsophisticated. Id. at 39, 46. Dr. Bloomfield categorized Leppert as "an immature conformist," meaning "she's ripe to conform to antisocial behaviors." Id. at 78. But he did not find her intellectually disabled, and did not conclude,

---

[20] Gerry Leppert said that she pulled Leppert out of public school shortly before the murder (when she was in ninth grade) but had enrolled her in Florida Virtual School. Ex. HH at 16, 24.

[21] Leppert's 17-year-old live-in boyfriend was Lowry, who initially lied to both Leppert and her mother about his age. Id. at 18-19.

[22] Dr. Bloomfield first met Leppert on August 11, 2008. Id. at 39. It appears he met with Leppert more than once to complete his February 3, 2009 report. Id. Dr. Bloomfield evaluated Leppert again in 2015, when she was about 22 years old. Id. at 49.

as Mr. Smith had been hoping, that she was not as intellectually or emotionally sophisticated as most 15-year-olds. Id. at 39, 141.

Dr. Bloomfield explained that a person's brain does not fully form until her twenties. Id. at 44-45. As such, "people of [Leppert's] age are more impulsive, less likely to weigh consequences and more likely to be adventuresome and take chances because of a lack of ability to discern . . . negative and positive consequences." Id. at 45. He found that true of Leppert, concluding that, at 15 years old, she was "making bad choices and was acting . . . impulsively because of her personality structure and because of her brain development." Id. at 78.

When asked what his testimony would have been had he been called as a witness at Leppert's trial, Dr. Bloomfield responded:

> [L]ikely if I would have been called to testify, I would have spoken about all the issues that I spoke about [at this hearing] and suggest the Court might consider that her ability to make those decisions is impaired by a combination of brain development, early personality development and the personality that emerges on her testing, so she's not fully cap -- she doesn't have full capacity to make those kinds of decisions; although, she is not irrational and she's bright. So I would have basically testified similar to how I testified today, trying to show a picture of this child and her state of mind and her -- the way her personality functions and way she functions and how that might be interpreted while at the same time saying that she is rational, lucid, coherent and not impaired cognitively.

43

Id. at 48-49.

Given both Gerry Leppert and Dr. Bloomfield essentially would have testified that Leppert was an intellectually and emotionally average (if on the low end of average) 15-year-old with respect to decision-making and maturity, it is unlikely the trial judge would have granted a request for the infancy instruction had Mr. Smith called them to testify. The trial judge noted at the charge conference that there was no legal authority supporting the proposition that a 15-year-old, based purely on age, "suffers from infancy" such that a 15-year-old cannot form intent to commit a crime: "I don't think we could . . . say that the defendant's age is such a commonly understood age or condition that automatically renders her or could possibly render her incapable of forming intent." Ex. K at 843. Indeed, the judge noted that if such a proposition were true, then a 15-year-old could never be tried as an adult. Id. Additionally, the judge expressed that the standard jury instructions sufficiently apprise the jury of its obligation to determine whether a defendant had the requisite intent, and he was "reluctant to deviate from the standard jury instruction[s]." Id. at 844-45.

Moreover, had Mr. Smith called Gerry Leppert and Dr. Bloomfield as witnesses and had the trial court permitted the infancy instruction, the outcome in all probability would have been the same. Contrary to Leppert's

contention, the jury indeed was "[]able to consider [her] immaturity and [alleged] lack of culpability." See Pet. Memo. at 22. Although the trial judge denied Mr. Smith's request for the special infancy instruction, the judge permitted Mr. Smith to argue in closing that Leppert was immature and unsophisticated and, therefore, unable to form the requisite intent. Ex. K at 845-47.

In his closing argument, Mr. Smith urged the jurors to find that Leppert, an immature and unsophisticated 15-year-old, merely followed the orders of 22-year-old Lowry, with whom she was in love and who controlled her every move. Id. at 938-39, 941-43, 945, 951-54, 957-58. He argued that Leppert, who was isolated and controlled by Lowry, was too immature and unsophisticated to have formed the conscious intent to kill a man. Id. at 935-36, 957-58. In finding Leppert guilty of first-degree murder, the jury must have disagreed. Therefore, no reasonable probability exists that the outcome of the case would have been different had Mr. Smith called the witnesses and had the trial court given the infancy instruction. See Richter, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable."). For the reasons stated, relief on the claim in Ground Four is due to be denied.

## E. Ground Five

As Ground Five, Leppert alleges her trial counsel was ineffective for failing to request the independent act jury instruction. Petition at 12; Pet. Memo. at 23. Leppert argues the evidence supported such a jury instruction because, in her recorded statement, she told authorities that her intention was to participate only in stealing Stewart's truck and money, and she refused to place the plastic bag over Stewart's head when Lowry told her to do so. Pet. Memo. at 23-24. In other words, she contends, the evidence showed that Lowry "departed from the original plan." Id. at 25.

Leppert raised this claim in her counseled Rule 3.850 Motion. Ex. FF at 14. In denying the claim, the postconviction court found as follows:

> Trial Counsel testified at hearing [sic] that the independent act instruction has never worked and based upon his experience, he made the apparent strategic decision not to request it.
>
> Under the circumstances, after a review of the record, the Court agrees that this was a proper strategy. Defendant actively participated in torturing and killing the victim. She stabbed him with a knife and hit him with a metal pipe. While the Medical Examiner testified that asphyxiation was the immediate cause of death, it was Defendant who searched for and found the plastic bag which she then handed to Toby Lowry to suffocate the victim. Defendant acted in concert with Toby Lowry to cause the victim's death. Even in her interview with the Putnam County Detective that was published to the

> jury, she explained "the reason why we killed him ..."
> Neither prong of <u>Strickland</u> has been met.

Ex. II at 4-5 (internal record citations omitted).

To the extent the Fifth DCA decided the claim on the merits, the Court will address the claim in accordance with the deferential standard for federal court review of state court adjudications. After a review of the record and the applicable law, the Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Thus, Leppert is not entitled to relief on the basis of this ineffectiveness claim.

Even if the appellate court's adjudication of the claim was not entitled to deference, Leppert's ineffectiveness claim fails. Based on the evidence, Mr. Smith was not deficient for not pursuing an independent act defense or request that instruction. Regardless, Leppert has not demonstrated "the result of the proceeding would have been different" had he done so. <u>See</u> <u>Richter</u>, 562 U.S. at 104.

> The "independent act" doctrine arises when one cofelon, who previously participated in a common plan, does not participate in acts committed by his cofelon, "which fall outside of, and are foreign to, the common design of the original collaboration." <u>Dell v. State</u>, 661

47

So. 2d 1305, 1306 (Fla. 3d DCA 1995) (quoting Ward v. State, 568 So. 2d 452 (Fla. 3d DCA 1990)). Under these limited circumstances, a defendant whose cofelon exceeds the scope of the original plan is exonerated from any punishment imposed as a result of the independent act. Id. See also Parker v. State, 458 So. 2d 750 (Fla. 1984). Where, however, the defendant was a willing participant in the underlying felony and the murder resulted from forces which they set in motion, no independent act instruction is appropriate. See Lovette v. State, 636 So. 2d 1304 (Fla. 1994); Perez v. State, 711 So. 2d 1215 (Fla. 3d DCA), review denied, 728 So. 2d 204 (Fla. 1998), cert. denied, 526 U.S. 1120, 119 S. Ct. 1772, 143 L. Ed. 2d 801 (1999); State v. Amaro, 436 So. 2d 1056 (Fla. 2d DCA 1983).

Ray v. State, 755 So. 2d 604, 609 (Fla. 2000) (citations cleaned up).

The jury heard from Leppert's own mouth (through her second recorded interview) that she actively participated in the events leading to Stewart's death, even if the initial plan was to commit only burglary and robbery. This evidence contradicts Leppert's claim in her Petition Memorandum that, when she refused Lowry's instruction to place the bag over Stewart's head, she "refused to participate any further and withdrew from the offense." See Pet. Memo. at 23-24. On the contrary, Leppert admitted that she willfully participated in all events from start to finish: she went to Stewart's house ahead of time under the ruse of needing to call her mother but really to "scope everything out"; she "poked" Stewart with a knife and hit him with aluminum poles which she had picked up on the side of the road and brought to the house

with her; she provided Lowry the plastic bag he used to suffocate Stewart and remained present while Lowry did so, knowing Stewart was still alive at that point because she could hear him breathing; she waited for Lowry while he showered the blood off his body afterward; she closed the blinds and locked the doors when they left Stewart's house; and she fled with Lowry in Stewart's truck. Ex. K at 722-25, 730-31, 737, 740-42.

Leppert readily acknowledged that she could have left Lowry when it became clear that Lowry was intent on killing Stewart, but instead she "helped kill [Stewart]" because she "love[d] [Lowry] so much" and she did not want to leave him. Id. at 738-39, 744, 748-49, 749. On that point, the jury heard the following exchange between Leppert and the detective:

> [Q]    Morgan, would we agree that at any point in time you wanted to you could have turned away and walked out of the house if you wanted to?
>
> [A]    If I wanted to, I could.
>
> [Q]    Why didn't you?
>
> [A]    Because I wasn't going to leave [Lowry].
>
> [Q]    You would commit murder because you didn't want to leave [Lowry]?
>
> [A]    I guess so, and I wanted to get out of Florida . . . .

Id. at 744. Leppert also made other statements during this interview—which the jury heard—suggesting her willing participation in all acts, including the one that led to Stewart's death: she said Stewart got what he "deserved"

because she thought he was "a pervert"; and she told the detective, "[T]he reason why <u>we</u> killed [Stewart was] because [Lowry] didn't want [Stewart] . . . to call . . . the cops . . . to report the truck stolen and we'd get caught . . . ." <u>Id.</u> at 726, 730, 745 (emphasis added). According to Leppert herself, the murder "lessened the immediate detection of the [underlying felonies] and apprehension of [Leppert and Lowry] and, thus, furthered [those crimes]." <u>See</u> <u>Lovette v. State</u>, 636 So. 2d 1304, 1307 (Fla. 1994).

Leppert's trial counsel cannot have been deficient when he failed to request a jury instruction or pursue a particular defense flatly contradicted by the evidence. Murder may not have been part of Lowry's and Leppert's initial plan, but the death of a robbery or burglary victim certainly is a foreseeable consequence of those crimes. Indeed, Leppert's jury was instructed on both felony murder and the "principal" theory of culpability:

> To prove the crime of first-degree felony murder, the State must prove the following three elements beyond a reasonable doubt:
>
> 1. James Thomas Stewart is dead.
>
> 2. a. The death occurred as a consequence of and while Morgan Amanda Leppert was engaged in the commission of burglary or robbery, or
>
> b. The death occurred as a consequence of and while Morgan Amanda Leppert was attempting to commit a burglary or robbery.
>
> 3. James Stewart was killed by a person other than Morgan Amanda Leppert; but both Morgan

> Amanda Leppert and the person who killed James Thomas Stewart were principals in the commission of burglary or robbery.
>
> In order to convict of first-degree felony murder, it is not necessary for the State to prove that the defendant had a premeditated design or intent to kill.
>
> . . . .
>
> If the defendant helped another person or persons commit or attempt to commit a crime, the defendant is a principal and must be treated as if she had done all the things the other person or persons did if:
>
> 1. The defendant had a conscious intent that the criminal act be done, and
>
> 2. The defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist, or advise the other person or persons to actually commit or attempt to commit the crime.

Ex. K at 883-84, 887, 898-99, 902-03. See also Lovette, 636 So. 2d at 1306 ("As perpetrators of an underlying felony, [cofelons] are principals in any homicide committed to further or prosecute the initial common criminal design."); Ray, 755 So. 2d at 609 (finding the independent act instruction was not warranted because the evidence showed the cofelons were joint "participants in the robbery and the murder resulted from forces they set in motion").

Leppert and Lowry jointly participated in "the initial common criminal design" to commit burglary and robbery, and through "forces they set in motion," Stewart was killed. See Lovette, 636 So. 2d at 1306; Ray, 755 So. 2d

at 609. As such, the independent act instruction was not warranted and, if read to the jury, would not have altered the outcome. For these reasons, Leppert is not entitled to federal habeas relief on the claim in Ground Five.

## VII. Certificate of Appealability
## Pursuant to 28 U.S.C. § 2253(c)(1)

If Leppert seeks issuance of a certificate of appealability, the undersigned opines that a certificate of appealability is not warranted. The Court should issue a certificate of appealability only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Leppert "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further,'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)).

Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. See Slack, 529 U.S. at 484. However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason

would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Id. Upon consideration of the record as a whole, the Court will deny a certificate of appealability.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1.     The Petition (Doc. 1) is **DENIED**, and this action is **DISMISSED WITH PREJUDICE**.

2.     The **Clerk** of the Court shall enter judgment denying the Petition and dismissing this case with prejudice.

3.     If Leppert appeals the denial of the Petition, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the **Clerk** shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.

4.      The Clerk of the Court is directed to close this case and terminate any pending motions.

**DONE AND ORDERED** at Jacksonville, Florida, this 27th day of March, 2024.

**MARCIA MORALES HOWARD**
United States District Judge

Jax-6
c:
Counsel of Record

54